Brianne C. McClafferty
Brent R. Bihr
HOLLAND & HART LLP
401 North 31st Street, Suite 1200
P.O. Box 639
Billings, MT 59103-0639
Telephone: 406.252.2166
BCMcClafferty@hollandhart.com
BRBihr@hollandhart.com

Annette Hurst (*admitted pro hac vice*)
Catherine Y. Lui (*admitted pro hac vice*)
Orrick, Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-4585
ahurst@orrick.com
clui@orrick.com

Christopher J. Cariello (*admitted pro hac vice*)
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone: (212) 506-3778
ccariello@orrick.com

Kristopher R. Wood (*admitted pro hac vice*)
Orrick, Herrington & Sutcliffe LLP
2050 Main Street
Suite 1100
Irvine, CA 92614-8255
Telephone: (949) 852-7722
kristopher.wood@orrick.com

**ATTORNEYS FOR DEFENDANT SNOWFLAKE INC.**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| DARIUS H. JAMES, individually and on behalf of a class of similarly situated individuals, <br><br> *Plaintiff*, <br><br> v. <br><br> SNOWFLAKE INC., a Delaware corporation, <br><br> *Defendant*. | Case No. CV-25-108-BU-BMM <br><br> **DEFENDANT SNOWFLAKE INC.'S PRELIMINARY PRETRIAL STATEMENT** |

Defendant Snowflake Inc. ("Snowflake") submits this Preliminary Pretrial Statement as directed by the Court's January 28, 2026, Order Setting Preliminary Pretrial Conference and Associated Deadlines [Dkt. 17] and Local Rule 16.2(b)(1):

## I.    FACTUAL OUTLINE OF THE CASE

Plaintiff Darius James ("James"), an author of books and other works, alleges in this putative class action lawsuit that Snowflake infringed his and purported class members' copyrighted works by downloading them from the internet and using them to train its foundational Arctic LLM (the "Arctic LLM" or "Arctic"). Snowflake's Arctic LLM is an enterprise-grade open-weight large language model ("LLM") distributed for use in conjunction with Snowflake's data cloud. James alleges that an unknown actor included copies of certain of his published works in an electronic compilation of books called "Books3," which in turn was part of a publicly available training data set called "Redpajama." James alleges that Snowflake downloaded Redpajama from the internet in 2023 and used it (including his works) to train the Arctic LLM, which was released in April 2024.

For purposes of this Pretrial Statement, Snowflake assumes that James's works were included in the training data it used to train Arctic, although it is still investigating that assertion. Like the numerous other cases that have been filed involving the use of books to train this generation of machine learning models, the issue here is how to evaluate the four fair use factors. 17 U.S.C. §107; *see Google LLC v. Oracle Am., Inc.*,

593 U.S. 1, 19 (2021) ("*Google v. Oracle*"). To do so, the Court will need a solid basis for understanding the nature of this technology. Unfortunately, the Complaint misapprehends what LLMs are, how they are trained, and how they operate.

LLMs, including Arctic, do not simply memorize and then regurgitate the texts they are trained on. They are not a searchable database of training material. Rather, during the training process, a massive volume and variety of texts (approximating the entirety of the internet in size) are filtered, de-duplicated, and tokenized. The tokenized text is then used to "train" a deep learning neural network. During the training process, the deep learning neural network is repeatedly exposed to portions of the tokenized data, enabling it to acquire statistical information that generalize a set of probabilistic relationships embodying semantics, grammar, facts, and other contexts of language. Once trained, an LLM is capable of generating a wide variety of entirely new text in response to a prompt from a user.

As two District Courts within this Circuit have thus found (*Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1044–45 (N.D. Cal. 2025); *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1022 (N.D. Cal. 2025)), an LLM is a transformative use of the underlying works, readily satisfying the first factor of the fair use analysis. Nor is there any credible allegation in the Complaint that the Arctic LLM – an enterprise-grade open-weight product – has caused cognizable fourth-factor harm to Darius James in the traditional markets for his book and screenplay works. Arctic is not a substitute

for James's works, and the Complaint does not allege that it has been used to infringe James's works. In short, the Complaint does not allege that Arctic has harmed James in any way—he simply would like to be paid for the use of his works in training Arctic. But the same is true in every fair use case. And the courts have recognized the tautological nature of this type of claim—the mere assertion of a desire for payment does not demonstrate copyright harm, and does not a fourth-factor market make.

Rather, as Snowflake intends to demonstrate in its defense of this action, Snowflake's use of the Books3 dataset to train its enterprise-grade open-weight Arctic model is a paradigmatic fair use.

## II.    BASIS FOR JURISDICTION AND VENUE

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 given that Plaintiff asserts a single claim of copyright infringement under 17 U.S.C. § 501. Defendant Snowflake does not contest that jurisdiction and venue are proper in this District.

## III.    FACTUAL BASES FOR SNOWFLAKE'S DEFENSES[1]

Assuming arguendo that Snowflake used Plaintiff's works to train its

---

[1] This case is in its early stages. Discovery has not yet begun and Snowflake is still investigating the facts alleged in the Complaint. Snowflake offers the following facts and legal theories based on its knowledge, information, and belief at this time. Snowflake intends no waiver of any arguments hereby and reserves the right to modify, amend, or supplement the foregoing facts and legal theories as the case progresses and new facts become known to Snowflake

foundational Arctic LLM, one of the main issues in this case is whether that use was a fair use under copyright law. To evaluate fair use, it will be important to understand (1) what an LLM is, how it is trained, and how it operates; and (2) how Snowflake trained and marketed the Arctic LLM.

A.   **Factual Overview of LLMs**

An LLM is a machine learning model that can read, understand, summarize, translate, reason from, and generate text, whether in natural language or computer code. LLMs are not like traditional computer programs, where human programmers write each and every line of code that strictly defines the program's output based on a given input. Nor is the point of an LLM is to simply memorize and regurgitate text on demand. An LLM that functioned that way would be a failure. Instead, the goal of an LLM is to encode a deep understanding of language, facts, and concepts so it can generalize and create something entirely new.

To accomplish this, an LLM is "trained" by feeding the model huge amounts of text.  That text is broken into "tokens," which are small units of data representing short words or syllables. The LLM analyzes the tokens to find statistical patterns within the text representing grammar, syntax, semantics, and other linguistic traits, which are used to set the parameters of the model. LLMs then use those parameters to generate new text by making predictions about what words are likely to come next in a given text based on a user prompt.

This training process requires a huge volume and variety of training data to successfully train an LLM. The model is best able to generalize when exposed to a wide variety of relationships among words in numerous contexts. At the same time, no one text or work used to train an LLM has any special value or importance. The individual tokens, and even individual works, have little influence in isolation. It is only in the aggregate—on the level of hundreds of billions or trillions of tokens—that training results in a viable LLM.

### B. Snowflake's Foundational Arctic LLM

Snowflake's foundational Arctic LLM, released in late April 2024, is an enterprise-focused LLM designed for tasks such as SQL generation, coding and development of enterprise agents. Snowflake offered its Arctic LLM free of charge under the Apache 2.0 license. Snowflake also offered a hosted version of its Arctic LLM as part of its AI platform.

The Arctic LLM has 480 billion total parameters, and 17 billion active parameters. Snowflake sourced its training data from publicly available materials, starting from high-precision web crawl data and refining that data in later rounds to business-specific training corpuses including programming data; coding, SQL, and math-specific sources; synthetic data sets; and its own internal documentation.

Ultimately, over the course of three training phases, Snowflake fed around 3.5 trillion tokens into its Arctic LLM. To put this in perspective, printed out on standard

8.5" x 11" paper, the tokens would cover nearly 6 billion pages resulting in a stack more than 360 miles high. Turned on its side, the stack would stretch from Great Falls, Montana to just a few miles short of Twin Falls, Idaho.

## IV.   THE LEGAL THEORY UNDERLYING EACH OF SNOWFLAKE'S DEFENSES

Based on its present knowledge, information and belief, Snowflake anticipates that it will defend this action based on the following legal theories.

**Fair Use**.  Assuming arguendo that Snowflake used Plaintiff's works to train its foundational Arctic LLM, any such use constitutes fair use under 17 U.S.C. § 107. *See Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 22 (2021); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994); *Authors Guild v. Google, Inc.*, 804 F.3d 202, 213–14 (2d Cir. 2015) ("*Google Books*"). Section 107 directs courts to consider four factors in evaluating whether the use made of a work is fair use, including:  "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107. The two most important factors are the first and fourth.[2]

---

[2] Courts have observed that factor 2 "has rarely played a significant role in the determination of a fair use dispute" (*Google Books*, 804 F.3d at 220), and as to factor 3, "the amount copied doesn't seem especially relevant" the context of training an LLM (*Kadrey*, 788 F. Supp. 3d at 1050).

The first factor is the purpose and character of Snowflake's use (if any) of the Plaintiff's and putative class members' works. The Supreme Court directs courts to consider whether the use is "transformative" in that it "'adds something new, with a further purpose or different character, altering' the copyrighted work 'with new expression, meaning or message.'" *Google v. Oracle*, 593 U.S. at 29-32 (quoting *Campbell*, 510 U.S. at 579, and holding Google's copying of parts of Oracle's API to create a new platform that would enable programmers to innovate was transformative use).

This factor strongly favors the finding of fair use, given the process of training an LLM is highly transformative. *See Kadrey*, 788 F. Supp. 3d at 1044–45 (holding Meta's use of copyrighted works to train its Llama LLM was transformative); *Bartz*, 787 F. Supp. 3d at 1022 ("the purpose and character of using copyrighted works to train LLMs to generate new text was quintessentially transformative."). As described above, training data is "tokenized" and then analyzed for statistical patterns underlying grammar, syntax and other linguistic traits. When training is completed, LLMs use those statistical patterns to generate novel content. LLMs rarely, if ever, regurgitate meaningful portions of works included in training data. Rather, "[l]ike any reader aspiring to be a writer", LLMs train "upon works not to race ahead and replicate or supplant them—but to turn a hard corner and create something different." *Bartz*, 787 F. Supp. 3d at 1022. Much like Google's use of parts of Oracle's API in *Google v.*

*Oracle*, Snowflake's alleged use of copyrighted works advances the fundamental goal of copyright law: to unlock new avenues for innovation and expression. *Google v. Oracle*, 593 U.S. at 31-32.

"The fourth statutory factor focuses upon the 'effect' of the copying in the 'market for or value of the copyrighted work.'" *Id.* at 35 (quoting 17 U.S.C. § 107(4)). The only harm that matters for this factor is the harm of market substitution. *Campbell*, 510 U.S. at 593. The Court should "consider the amount of money that the copyright owner might lose," but also must consider "the source of the loss." *Google v. Oracle*, 593 U.S. at 35 (providing the example of "lethal parody" that might destroy the market for a work, but is not a cognizable loss). The court also must consider the "public benefits the copying will likely produce" such as fostering "the creative product of new expression," as well as how important those benefits are compared to the magnitude of the copyright holder's losses. *Id.*

The Complaint discloses no danger of substantial harm to the market for Plaintiff's works, particularly since Snowflake's Arctic LLM is an enterprise-grade open-weight LLM distributed for use in conjunction with Snowflake's data cloud. It is a tool designed to assist businesses in understanding their data. For example, the Arctic LLM is intended for tasks like SQL generation, coding and instruction following.  Even were such harm cognizable, Artic LLM is unlikely to facilitate the mass generation of critical, social commentary, and satirical works like Plaintiff's.  *See Bartz*, 787 F. Supp.

3d at 1032 (this "complaint is no different than … training schoolchildren to write well … result[ing] in an explosion of competing works."). Further, such harm is not cognizable because "[t]he [Copyright] Act seeks to advance original works of authorship, not to protect authors against competition." *Id.*

Nor can Plaintiff rely on the loss of a potential market "defined as the theoretical market for licensing the very use at bar" because that would result in a circular inquiry. 4 *Nimmer on Copyright* § 13F.08 (2026); *Google v. Oracle*, 593 U.S. at 38 (quoting *Nimmer* with approval). Even if a market for licensing works to train LLMs were to develop, the "market for that use is not one the Copyright Act entitles Authors to exploit." *Bartz*, 787 F. Supp. 3d at 1032[3]; *accord Kadrey*, 788 F. Supp. 3d at 1052 (holding "to prevent the fourth factor analysis from becoming circular and favoring the

---

[3] In the *Bratz* case, Judge Alsup identified multiple "uses" involved in training LLMs—distinguishing between (1) the use of works for the training itself (which is non-actionable fair use), and (2) the compilation of a standing library of works that could be used for training or any other purpose (a potentially actionable use depending on whether or not the party gained lawful access to the works). *Bartz*, 787 F. Supp. 3d at 1033. This distinction is an artificial one, and does not hold up under scrutiny, as observed by Judge Chhabria in the *Kadrey* case. 788 F. Supp. 3d at 1047 ("To the extent the plaintiffs suggest that [copying via downloading] must be considered wholly separately from [copying for training], they are wrong. To be sure, Meta's downloading is a different use from any copying done in the course of LLM training. But that downloading must still be considered in light of its ultimate, highly transformative purpose: training Llama"); *see also Google Books*, 804 F.3d at 216–18 (considering the creation of digital copies of books in light of the secondary user's overall purpose of creating a searchable database).

rightsholder in every case, harm from the loss of fees paid to license a work for a transformative purpose is not cognizable.").

Moreover, a cognizable market for licensing works for AI training does not exist for at least two reasons. First, the transaction costs of acquiring licenses to all works necessary for a corpus of training data are insurmountable in both time and money. Training an AI model requires trillions of tokens to create a basic functioning model. To negotiate with all individual authors necessary to acquire such a volume and variety of copyrighted material would be like negotiating with the entire internet—it would take endless amounts of time and money with no guarantee of success, killing the project from the outset. Second, there is no means of attributing value to any particular work in a massive training corpus. There is no way to trace the contribution of any particular tokens in the development and operation of the model. Without the ability to attribute value, there is no ability to effectively price the data even were a party to try to undertake a course of such negotiations.

Tokens thus have no value individually, or even at scales of the hundreds of thousands (which approximates a book). The end result of this is a market failure, a paradigmatic case for fair use. *See* Wendy J. Gordon, *Fair Use As Market Failure: A Structural and Economic Analysis of the Betamax Case and Its Predecessors*, 82 Colum. L. Rev. 1600, 1613 (1982); *see also Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929-30 (2d Cir. 1994) ("courts have recognized limits on the concept of

'potential licensing revenues' by considering only traditional, reasonable, or likely to be developed markets when examining and assessing" the fourth fair use factor).

**No copying or use of the Works**. While its investigation is still ongoing, Snowflake contends that it has no liability to the extent neither Plaintiff's, nor any putative class members', copyrighted works were actually copied or used to train its foundational Arctic LLM.

**Works or Elements of Works Not Protected By Copyright**. Plaintiff's claim fails to the extent he claims rights to elements of works or to works that are not protectable under copyright law, including under the doctrines of *scènes à faire*, merger, or under 17 U.S.C. § 102(b), or because such works are in the public domain, lack the requisite originality, are unregistered, or are works to which copyright protection has been abandoned. Plaintiff's claim also fails to the extent LLMs learn from aspects of the works in this suit that are not protected; that is, the statistical relationships among the words within the works reflect unprotected elements such as grammar, syntax, ideas and facts.

**Lack of Standing/Invalid Ownership/Lack of Ownership**. Plaintiff's claim fails, in whole or in part, because he lacks standing to bring suit and assert copyrights in any works that (a) were not copied or (b) were not used for training the Arctic LLM, or (c) he does not own or exclusively license, including pursuant to 17 U.S.C. § 501(b).

**Lack of Injury**.  Plaintiff has not suffered and is not likely to suffer any injury or damages as a result of the conduct alleged of Snowflake in the Complaint. It is unclear whether Plaintiff's works were even copied or used to train the Arctic LLM. If they were, sales or licensing of his works have not been and are not likely to be substantially harmed by the availability of Snowflake's Arctic LLM.

**Unavailability of Restitution**.  Plaintiff alleges an entitlement to restitution. Complaint ¶ 42. But the Copyright Act does not carry some general right to restitution; it is not just any putative unjust enrichment to the copier that must be restored. Rather, the Act provides for disgorgement of profits only when there are such profits and they are attributable to the alleged unlawful copying of the work. 17 U.S.C. § 504(b); *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002) ("we have held that a copyright holder must establish the existence of a causal link before indirect profits damages can be recovered."). It defies credulity to think that there is any connection between the use of James's works *Negrophobia*, *That's Blaxploitation!: Roots of the Baadasss 'Tude* in the training data (if any), on the one hand, and an enterprise customer's ability to use Arctic LLM to mine its financial data for cost savings, on the other. *See id.* at 916 (holding that profits from a symphony's advertisement that used, among other things, an image of the plaintiff's statute were too speculative because there was no way to distinguish the value of the photograph from other factors such as "the Symphony's reputation, or the conductor, or a specific musician, or the dates of the concerts, or the

new symphony hall, or the program, or the featured composers, or community boosterism, or simply a love of music"); *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 715 (9th Cir. 2004) (reversing award of damages based on jury verdict due to a lack of a causal link between infringing trade show marketing materials and increased sales, where "[a]ctual retail purchasers were never exposed to the infringing images from the trade shows, nor did the evidence link retail consumers to the trade show promotion."). Finally, Snowflake has no profits at all from the sale or use of the model, which was distributed on an open-weight basis.

**Unavailability of Injunctive Relief**.  Any injury to Plaintiff is not immediate or irreparable, Plaintiff would have an adequate remedy at law, the balance of hardships favors no injunction, and the public interest is best served by no injunction.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392–93 (2006) ("this Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed.").

**Unconstitutional Damages**. Any award of statutory or enhanced damages would constitute an unconstitutional penalty under the circumstances of this case and would violate the due process and equal protection guarantees, and other substantive and procedural safeguards afforded by the United States Constitution. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996).

## V.    COMPUTATION OF DAMAGES

Snowflake reserves the right to pursue an award of attorneys' fees and/or costs under appropriate circumstances.

## VI.    PENDENCY OF RELATED STATE OR FEDERAL LITIGATION

To Snowflake's knowledge, information, and belief, there are no related cases.

## VII.    PROPOSED ADDITIONAL STIPULATIONS OF FACT AND UNDERSTANDING OF APPLICABLE LAW

The parties have conferred on, and Plaintiff has filed (or soon will file), a Statement of Stipulated Facts. Snowflake proposes no additional facts at this time, but reserves the right to do so later. Snowflake understands that Federal copyright law governs this case.

## VIII.    PROPOSED DEADLINES RELATING TO THE JOINDER OF PARTIES OR AMENDMENT OF THE PLEADINGS

*See* the Parties' Joint Discovery Plan, which Plaintiff has or soon will file, and which includes deadlines for the joinder of parties and amendment of the pleadings (both on March 18, 2026).

## IX.    IDENTIFICATION OF CONTROLLING ISSUES OF LAW SUITABLE FOR PRETRIAL DISPOSITION

Snowflake intends to file a motion for summary judgment on, at minimum, its fair use defense, described in detail above. The Parties have agreed that any motions for summary judgment and Plaintiff's motion for class certification should be briefed simultaneously, as set forth in the Parties' Joint Discovery Plan, which Plaintiff has or

soon will file. *See Bartz*, 787 F. Supp. 3d at 1019 (summary judgment order noting that a contemporaneous motion for class certification was then-pending). The fair use defense and other issues raised on summary judgment may moot the question of whether a class should be certified. Thus, the Second Circuit requires sequencing summary judgment *before* class certification, and District Courts in this Circuit have also adopted that procedure. *See, e.g., Google Books*, 721 F.3d at 134; *Kadrey*, 788 F. Supp. 3d at 1043.

## X.    KNOWN INDIVIDUALS WHO MAY HAVE RELEVANT INFORMATION

### A.    Individuals Affiliated with Defendant Snowflake

This case is obviously in its early stages and discovery has not commenced. Consequently, Snowflake has not yet identified individuals with knowledge of James's allegations and is in the process of investigating the claims. However, Snowflake will include a list of percipient witnesses in its initial disclosures.

### B.    Individuals Affiliated with Plaintiff James

#### 1.    Plaintiff Darius H. James.

o   On information and belief, may be contacted c/o Plaintiff's counsel. c/o John Heenan, Heenan & Cook PLLC, 2224 Montana Avenue, Billings, MT 59101, telephone: (406) 840-0353.

o   Subjects:  Plaintiff's copyrighted works that Snowflake allegedly infringed, including the creation, registration, licensing, sales, revenue, profits and any other issues related thereto. Harm to the market for Plaintiff's work from Snowflake's alleged infringement. Damages to Plaintiff from Snowflake's alleged infringement. Biographical and commercial information necessary to evaluate

Plaintiff's claim that he is a typical and adequate class representative.

## C.  <u>Third Parties</u>

### 1.  <u>Macmillan Publishers (St. Martin's Press).</u>

o  Contact information for St. Martin's Press is not currently known to Snowflake.

o  Subjects:  Publication sales, royalties, licensing, and distribution of *That's Blaxploitation!: Roots of the Baadasssss 'Tude (Rated X by an All-Whyte Jury)*.

### 2.  <u>New York Review of Books.</u>

o  Snowflake is informed and believes that the New York Review of Books can be contacted at New York Review Books, 207 East 32nd St, New York, NY 10016-6305, Tel: 212 757-8070, Fax: 212 333-5374.

o  Subjects:  Publication, sales, royalties, licensing, and distribution of *Negrophobia: An Urban Parable*.

### 3.  <u>Other Publishers of Plaintiff's Works.</u>

o  The identities of any other publishers of Plaintiff's works are not known to Snowflake at this time.

o  Subjects:  Publication, sales, royalties, licensing, and distribution of Plaintiff's works that Snowflake allegedly infringed.

### 4.  <u>Distributors of Plaintiff's Asserted Works.</u>

o  The identity and contact information of the distributor or distributors of Plaintiff's works in suit is not currently known to Snowflake.
o  Subjects:  Sales, royalties, licensing, and distribution of Plaintiff's works that were allegedly infringed by Snowflake.

**5.    Licensees of Plaintiff's Asserted Works.**

o   The identity and contact information of licensees of Plaintiff's works in suit is not currently known to Snowflake.

o   Subjects:  Sales, royalties, licensing, and distribution for Plaintiff's works that were allegedly infringed by Snowflake.

**6.    Together Computer, Inc.**

o   On information and belief, contact c/o Joseph R. Wetzel, Latham & Watkins LLP, 505 Montgomery Street, Suite 2000, San Francisco, California 94111, Telephone: (415) 391-0600.

o   Subjects: Posting of Redpajama-1T data set to Huggingface.co; removal or disabling of the Books3 data set.

**7.    Huggingface.co.**

o   Contact information for Huggingface and specific individuals with knowledge are not yet known to Snowflake.

o   Subjects: Posting of Redpajama-1T data set to Huggingface.co; removal or disabling of the Books3 data set.

## XI.    INSURANCE AGREEMENTS THAT MAY COVER ANY RESULTING JUDGMENT

Snowflake has a series of insurance policies that may cover the claim asserted in this dispute. The specific details related to Snowflake's policies will be produced upon entry of a stipulated protective order in this matter.

## XII.   THE STATUS OF ANY SETTLEMENT DISCUSSIONS AND PROSPECTS FOR COMPROMISE

Snowflake is always willing to explore settlement but believes a rapid march toward consideration of fair use on summary judgment will be the most efficient means to resolve the case given the class considerations.

## XIII.  SUITABILITY OF SPECIAL PROCEDURES

Given the circumstances of this case and the courts' practices in similar litigation, Snowflake proposes the following special procedures.

Addressing "Big Data" Concerns in Discovery:  As described above, this dispute turns on the training data Snowflake used to train its Arctic LLM. Snowflake's Arctic LLM has almost 480 billion total parameters, and training of the model required massive amounts of data, which utilized 3.5 trillion tokens. It would be functionally impossible to review and produce such materials through traditional discovery practices. Therefore, Snowflake has prepared and shared with Plaintiff a proposed inspection protocol establishing procedures for the inspection and production of relevant training data (though it may be extended to other voluminous or highly sensitive ESI). The inspection protocol is based on examples from other litigation involving LLMs.

Technical Tutorial:   To resolve this case, the Court will need a detailed understanding of LLMs, including what they are, what they do, and how they do it. While Snowflake has provided an overview in this Preliminary Pretrial Statement, the

concepts can be difficult to convey in text alone. Snowflake proposes that the Parties provide the Court with a detailed tutorial, with demonstratives, of the pretraining, training, testing, and operation of LLMs of the type at issue in this case. Snowflake will prepare a stipulated order setting forth the process by which such tutorial may be conducted subject to the Court's approval. Defendants will be prepared to discuss this proposal with the Court at the initial conference.

## XIV.  ANY ISSUES RELATING TO THE DISCLOSURE OR DISCOVERY OF ELECTRONICALLY STORED INFORMATION, INCLUDING PRESERVATION AND THE FORM OF PRODUCTION

As described more fully in the Parties' Discovery Plan, Snowflake anticipates that in addition to the common categories of documents and electronically stored information (i.e., email communications, instant messages, Google Suite documents, and similar file types), discovery in this action will likely require inspection of the voluminous training data used to train Snowflake's Arctic LLM. Snowflake has prepared and shared with Plaintiff stipulated orders to address these aspects of discovery, including a Protective Order, an Order re: the Discovery of Electronically Stored Information, and a Stipulated Order re: the Inspection of Training Data. These will be submitted to the Court for approval in due course.

As set forth in the draft Order re: the Discovery of Electronically Stored Information, and Protective Order, Snowflake anticipates ordinary electronic documents other than training data generally will be produced in an electronic format,

either in .pdf format, .jpeg format, or in .tiff format with a load file and various metadata fields intact, at the election of the party propounding the production requests. The primary exceptions would be: (1) files in formats such as Google Sheets or Excel that will be produced natively so that they are comprehensible, and (2) LLM training data, which will be made available for inspection and copying under terms agreed upon by the Parties or set by the Court.

DATED this 17th day of February 2026.

/s/ Brianne C. McClafferty
Brianne C. McClafferty
Brent R. Bihr
Holland & Hart LLP

Annette Hurst (*admitted pro hac vice*)
Catherine Y. Lui (*admitted pro hac vice*)
Christopher J. Cariello (*admitted* (*pro hac vice*)
Kristopher R. Wood (*admitted pro hac vice*)
Orrick, Herrington & Sutcliffe LLP

ATTORNEYS FOR DEFENDANT
SNOWFLAKE INC.

37075363_v1